DENNIS K. BURKE
United States Attorney
District of Arizona

KEVIN RAPP
Arizona State Bar No. 014249
Kevin.Rapp@usdoj.gov
CHARLES W. GALBRAITH
Arizona State Bar No. 025869
Charles.Galbraith@usdoj.gov
Two Renaissance Square
40 North Central Avenue, Suite 1200
Phoenix, Arizona 85004-4408
Telephone (602) 514-7500
kevin.rapp@usdoj.gov

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | CR 08-0256-PHX-SMM |
| Plaintiff, | |
| v. | **GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM** |
| Mario Bernadel, | |
| Defendant. | |

The Plaintiff, United States of America, files a response to defense objections and a sentencing memorandum for the court's consideration.  This memorandum addresses both United States Sentencing Guidelines ("U.S.S.G.") and Title 18, United States Code, Section 3553 ("§ 3553") factors to be considered when imposing a sentence.

I.      **Preliminary Statement**

Defendant Mario Bernadel was a leader of one of the largest and most devastating mortgage fraud conspiracies ever prosecuted to date in the District of Arizona.  Over a period of two years, defendant and his co-conspirators lured dozens of straw buyers to engage in fraudulent transactions that would drive them into bankruptcy, economic collapse, and often severe emotional damage.  The losses to lenders from the charged conspiracy were approximately $9.5 million.  (*See* Exhibit A.)  As a result of the cash back scheme, defendant and his co-conspirators caused thirty-six  homes to go into foreclosure.  *Id.*  From these foreclosures, the neighborhoods affected by fraud suffered additional losses.

Defendant's presentence report ("PSR") advisory guideline calculation calls for a sentence range of 210-264 months.  Although this is a lengthy sentence for a white collar

offense, the Court should not hesitate to impose a significant sentence.  A lengthy sentence is needed to adequately punish defendant and deter others who would follow in his footsteps.  Unlike many white collar crimes, mortgage fraud injures more than just the target of the fraud.  Mortgage fraud hurts not just the lenders, but also the borrowers, the neighborhoods, and every citizen who relies on the integrity of our financial institutions and real estate market.

Yet the allure of easy money is difficult to resist for those who would make millions merely from false statements.  Reports to law enforcement of new cases of mortgage fraud are increasing, and overwhelming.  In just the past five years, the FBI's mortgage fraud caseload has increased by 400 percent.  Investigative resources are inadequate.  A heavy and just sentence for defendant will send a clear message that mortgage fraud will not be tolerated in this District.  Such a sentence from this Court is required both to justly punish defendant for his devastating crimes and to deter future offenders from committing this pervasive and lucrative crime.  Accordingly, a Sentence of 240 months is supported by the U.S.S.G. and factors set forth in § 3553.

## II.    Procedural Background

In March, 2008, a grand jury for the District of Arizona returned an indictment against defendant and seven other co-conspirators.  The indictment alleged a wide-ranging mortgage fraud conspiracy along with numerous substantive counts.  The indictment named eight members of the conspiracy and specified their roles.  Among others, the indictment specified that defendant, executed the conspiracy along with loan officers, an escrow officer, straw buyers and other investors.

Trial commenced on August 24, 2009.  On September 7, 2009, following two weeks of evidence, defendant was found guilty by the jury beyond a reasonable doubt of nineteen counts.  The counts of conviction included conspiracy, five counts of mail fraud, seven counts of wire fraud and one count of bank fraud.  In addition, defendant was convicted of four counts of transactional money laundering in violation of 18 U.S.C. § 1957.

### III.    Guideline Range

In determining the appropriate sentence, a district court must begin by correctly calculating the applicable guidelines range and determine, if it is reasonable. *United States v. Miqbel,* 444 F.3d 1173, 1176 (9th Cir. 2006). The advisory guidelines are "the starting point and the initial benchmark." *Gall v. United States*, 128 S.Ct. 586, 596 (2007). However, the appropriate sentence is for the district court to determine based on the factors enumerated in § 3553.

When reviewing sentences the court considers the substantive reasonableness of the sentence. *United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc). "It would be procedural error for a district court to fail to calculate-or to calculate incorrectly-the Guidelines range; ... to fail to consider the § 3553(a) factors; ... or to fail adequately to explain the sentence selected...." *Id.*

Indeed, the sentence imposed by this court is entitled to great deference on appeal. As the Fourth Circuit, in affirming a recent sentence in a fraud case that was 300% in excess of the advisory guideline range, explained:

> [T]he court of appeals should give due deference to the district court's reasoned and reasonable decision that the § 3553(a) factors, on the whole, justify the sentence. Deference is required because the sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case. Moreover, district courts have an institutional advantage over appellate courts in making these sorts of determinations as they see so many more guidelines sentences than appellate courts do.

*U.S. v. Evans*, 526 F.3d 155, 162 (4th Cir. 2007) (internal quotations omitted) (affirming sentence of 125 months for defendant who pled guilty to fraud charges, despite advisory guideline range of 24-30 months).

### IV.    Factual Background

The evidence at trial showed that defendant led a wide-ranging mortgage fraud scheme in which the conspirators submitted false information to defraud lenders of money in the form of mortgage loan proceeds.

### A.  Recruiting Straw Buyers to "Invest" in Real Estate

The indictment alleged and the evidence showed that defendant and the other promoters recruited or caused others to recruit straw buyers to participate in the mortgage fraud scheme by generally promising that they (a) could buy an investment home with no money down; (b) would receive payment of approximately $5,000 to $10,000 for the use of their credit at the time of closing for participating in the scheme; and (c) the promoters would either sell the property and keep the profit, or put renters in the homes to cover the mortgage payments until the property later could be sold for a profit.

Defendant and others recruited straw buyers who were financially unsophisticated, had good credit, and placed an undue amount of trust with the promoters of the scheme. They primarily came from two main sources: friends and family members. Defendant represented to straw buyers that he was an "investor" in order to support the promise that lending their name and credit to the scheme would be a good investment. Defendant would prepare the straw buyer's loan application or direct a loan officer to prepare the loan application with false information supplied by defendant. For example, defendant's brother, Ducamond Chataigne ("Chataigne"), testified that defendant would send him completed loan applications with incorrect asset and income information. These applications were eventually submitted with the promise that defendant would take responsibility for making the mortgage payments on multiple properties. Chataigne's testimony confirmed that defendant told him that defendant functioned like a real estate agent and portrayed himself as being in the business of investing in real estate and looking for "investors."

The straw buyers fell for defendant's and the other co-conspirator's pitch that the houses were an "investment," never guessing that their trust would be abused by being sold a house (or in some cases multiple houses) when defendant and others promised to make the mortgage payments but had no intention to do so. Defendant and the other co-conspirators put themselves in a position of private trust with the straw buyers, by telling them that they were loan officers or investors, in order to gain their trust. The straw buyers trusted defendant and his co-conspirators so much that they provided their most personal and confidential financial information: their social security numbers, bank account numbers, as

well as information about their income and assets.  Moreover, the straw buyers trusted defendant with one of the most important possessions of any modern citizen: their credit.

### 1. Executing the Scheme

Once the straw buyers were recruited and had provided their financial information, defendant and the other promoters (Adorno and Lucero) would use the straw buyer's financial information to fill out a loan application, falsifying information where necessary. Among other things, defendant and the other promoters commonly falsified information about the buyer's assets, their intent to live in the property, and whether they had rented their own home.  These lies were supported by phony documents as needed.  The false loan application would then be provided to lenders or other mortgage brokers in the conspiracy, who would arrange for a loan to be made in the straw buyer's name.

The loan would be arranged in connection with a property that defendant and the other promoters would locate in order to obtain cash back at closing by selling the home to a straw buyer for an inflated price.  Typically, defendant and the other promoters would receive cash back at closing that would be disguised in the escrow file and the HUD-1 as a remodeling or decorating fee to conceal the inflated sales price.  The escrow officer, Bartlemus, facilitated these fraudulent cash back transactions.  This would leave defendant and the other promoters with a profit from the inflated sales price of a home.

The earnest money needed to obtain these loans was provided by defendant and the other promoters.  It would be reflected to the lender however, that these monies came from the straw buyer when in fact it did not.  Once the loan was funded, the cash back would be paid to defendant and the other promoters.  Defendant and the other promoters would then make cash payments to the straw buyer, leaving him with the remainder of the cash back which constituted his profits.  A portion of those profits would then be used to fund the next fraudulent transaction, starting the crime anew.

Eight members of this conspiracy including defendant and other loan officers, an escrow officer, recruiters, a false employment verifier and straw buyers have plead or been found guilty by a jury in this Court.  Defendant was the leader of the conspiracy–teaching

other loan officers how to recruit straw buyers and receive cash back at closing.  As further detailed below, the defendant has apparently attempted to continue the scheme, while in custody, after the other defendants had pled guilty and he was convicted at trial.

### 2. Defendant's Continuation of Fraudulent Activities After Conviction.

All other co-conspirators indicted in the the scheme have pled guilty and accepted responsibility in short order.  Loan officers Lucero, Adorno, Brittany Parish and Marcus Branch pleaded guilty and cooperated in 2009.  Escrow officer Bartlemus pled guilty in August 2009.  And, straw buyers/recruiters Stephanie McWilliams and John Webber also pled guilty in August 2009.  These other co-conspirators took responsibility for their actions, initiated cooperation, and stopped engaging in the transactions after they were questioned by the FBI and became aware of the investigation.  Not so for defendant Mario Bernadel.

Indeed, defendant continued engaging in the mortgage fraud scheme while incarcerated for Bankruptcy Fraud and pending sentencing in the instant case.[1]  The letters and recorded jail calls obtained *after* conviction exhibit all the same characteristics of the original conspiracy.  For example, defendant appears to be trying to recruit individuals to purchase homes for him.  (*See* Exhibit B; letter from Bernadel to Steve Molitor)  The letter is dated approximately two weeks *after* he was convicted by a jury in this case.  In the letter he is making inquiries about properties for both he and his daughter.  He is looking for a property less than $900,000 for his daughter and property for himself priced at $3,000,000. It clear that his conviction did not deter him from his criminal activities.

Moreover, a review of defendant's jail calls also demonstrates that he continues to engage in fraudulent activities following his conviction.  Attached as Exhibit C is a FBI 302 and summary of jail calls reviewed by the investigating agent.  The calls detail defendant's attempt to engage in real estate transactions.  Again, it is clear that his conviction for Bankruptcy Fraud by a plea agreement and his conviction by jury, for numerous counts related to mortgage fraud, has done nothing to discourage defendant from engaging in

---

[1]  Defendant pled guilty in CR-06-0260-PHX-JAT to two counts of False Declarations in a Bankruptcy Proceeding and was sentenced to thirty-six months. (PSR¶35).

fraudulent transactions.

### 3. The Losses

The losses from defendant's scheme were devastating.  Defendant and his co-conspirators caused lenders to issue tens of millions of dollars in loans.  (*See* Exhibit A; spread sheet of losses from each property involved in the conspiracy)  The intended and actual losses from the conspiracy -- just to the lenders -- were approximately $9.5 million. The neighborhoods in which defendant and the other co-conspirators facilitated purchases for straw buyers suffered additional losses due to the foreclosures caused by defendant's scheme. These foreclosures have devastating results to communities; there is a decline in home values, loss of tax revenue and job losses.

More importantly, these losses caused by defendant were all foreseeable.  Defendant knew that the properties eventually would go into foreclosure for several reasons.  First, defendant knew that the straw buyers did not have sufficient income to make the mortgage payments.  As noted, defendant in many instances  collected the straw buyer's financial information, knew how much each straw buyer earned, and therefore knew it would be impossible for them to make the payments on multiple properties.  Worse, defendant attempted to use his straw buyer's credit to purchase as many homes as possible before the purchases appeared on the straw buyer's credit report.  It simply would have been impossible for the straw buyers to make the payments on several houses at once.

Second, defendant knew he would not put renters in many houses, so in most instances no rent money would be available to pay the mortgage.  Third, even when there was a temporary renter, defendant knew the rent would not cover the mortgage payments.  To earn the "cash back" at closing, defendant had increased the home price far beyond what it was worth, and thus far beyond what any renter could be expected to pay.  Fourth, defendant knew that any one of the false statements defendant created for the loan applications could and would invalidate the loan once discovered.  A condition of the loans was that the statements made to receive the loan were true.  Thus, the false representations about primary residence or any of the other material matters about which defendant lied alone could start

7

the foreclosure process.  Finally, in some cases, the straw buyers flatly told defendant and the co-conspirators that they were unable to afford the properties.

As the court heard during the trial as a whole, defendant's pattern was to use a given straw buyer to buy as many homes as possible within a relatively short period of time, and then to stop returning the straw buyers' phone calls once trouble began.  Thus, there can be little question that the foreclosures were foreseeable to defendant.

Defendant's foreclosures had a devastating impact on the neighborhoods.

**V.      Sentencing Guideline Calculation**

As detailed below, the PSR fails to assess a number of upward adjustments that would increase the defendant's guideline range beyond the current range of 210 to 262 months.

**A.  Sophisticated Means section 2B1.1(b)(9)(C)**

The PSR  fails to  impose a two-level enhancement for sophisticated means pursuant to U.S.S.G. §2B1.1(b)(9).  There is little question that defendant's scheme involved sophisticated means.  The evidence at trial showed that defendant's offense involved, among others, the following sophisticated tactics: (1) purchasing cashier's checks for down-payments and earnest money in the names of the straw buyers to mislead lenders about the true source of the funds; (2) quit claiming the properties to Compass Development after closing; (3) phony verifications of deposit; (4) phony verifications of employment; and (5) instances of straw buyers' names being forged on real estate documents.

The combination of these sophisticated tactics warrants an enhancement for sophisticated means; indeed, the use of any one such tactic alone arguably would justify the enhancement. *e.g.*, *United States v. Septon*, 557 F.3d 934, 937 (8th Cir. 2009) (affirming sophisticated means enhancement when the defendant's "scheme involved submitting numerous loan applications to lenders containing forged signatures, forged notary stamps, and falsified or altered tax returns, pay stubs, gift letters, bank statements, and bank notes."); *United States v. Wright*, 496 F.3d 371, 379 (5th Cir. 2007) (scheme that involved purchasing cashier's check in someone else's name qualified for sophisticated means enhancement); *See also United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) (scheme that involved, among other

8

things, "forged signatures on real estate transactions" was sophisticated); *United States v. Robinson*, 538 F.3d 605, 607 (7th Cir. 2008) (use of phony contact information satisfied the requirements for sophisticated means); *United States v. Edelmann*, 458 F.3d 791, 816 (8th Cir. 2006) (mortgage fraud defendant who used false documents and forged signatures properly given sophisticated means enhancement); *United States v. Amico*, 416 F.3d 163, 169 (2d. Cir. 2005) (creation of false bank documents and false appraisals, among other facts, justified sophisticated means enhancement); *United States v. Okolom*, no. 03-4402, 2003 WL 22952734, (unpublished) (4th Cir. 2003) (rejecting the defendant's argument that there was "nothing unusual, complex, or intricate about the documents used to obtain the loans" and affirming the district court's finding that submission of false documents and false back up documentation supported sophisticated means enhancement in bank fraud scheme). Accordingly, the PSR fails to include a two-level enhancement for sophisticated means pursuant to U.S.S.G. §2b1.1(b)(9).[2]

**B.     Derivation of More Than $1,000,000 in Gross Receipts From Financial Institutions Pursuant to Section 2B1.1(b)(14)(A).**

The PSR fails to impose a two-level enhancement for derivation of more than $1,000,000 in gross receipts from financial institutions pursuant to §2B1.1(b)(14)(A). Defendant's scheme caused financial institutions to provide tens of millions of dollars in loans. The evidence introduced at trial alone showed that defendant and his co-conspirators personally and directly received gross receipts of approximately $1,810,813.71 from the distribution of funds for "cash back" derived from financial institutions as a result of the fraud. (*See* Exhibit D.) Moreover, the amount received from financial institutions in loan proceeds from the nineteen counts of conviction was more than $17,000,000. (*See* Exhibit G) It would be no defense that defendant did not receive all the money (related to the counts of conviction) directly. *United States v. Gharbi*, 510 F.3d 550, 555-56 (5th Cir. 2007), *cert.*

---

[2] In *United States v. Lutrel Sharpe et al.* CR07-00544-PHX-ROS and *United States v. Daniel Morar, et. al*, CR08-00612-PHX-NVW both U.S. District Court Judges Roslyn O. Silver and Neil V. Wake found that similar cash back schemes were *sophisticated* within the meaning of §2b1.1(b)(9).

1   *denied*, 128 S. CT. 2892 (2008) ("it is unavailing for [the defendant] to argue that, because

2   the funds never passed through his hands, he did not 'derive' the loan proceeds . . . .  A

3   defendant derives proceeds under §2B1.1(13)(A)[3] where he causes them to be lodged in

4   another with the expectation that he will enjoy the benefits.").  Accordingly, the PSR fails to

5   impose a two-level enhancement for derivation of more than $1,000,000 in gross receipts

6   from financial institutions pursuant to section 2B1.1(b)(14)(A).

7   **C. Abuse of Position of Trust Pursuant to Section 3B1.3**

8   Defendant occupied a position of private trust with several of the straw buyers,

9   particularly his brother, Ducamond Chataigne, and therefore should receive a two-level

10   enhancement pursuant to §3B1.3 of the guidelines.  That provision provides, in relevant part,

11   that "[i]f the defendant abused a position of . . . private trust . . . in a manner that significantly

12   facilitated the commission or concealment of the offense, increase by two levels."  *Id*.  In the

13   Ninth Circuit, to support the abuse of trust enhancement, "a position of trust ... must be

14   established from the perspective of the victim." *United States v. Hill*, 915 F.2d 502, 506 n. 3

15   (9th Cir.1990); *See also United States v. Barnes*, 125 F.3d 1287, 1292 (9th Cir.1997).

16   The evidence relating to the straw buyers alone is sufficient to support the application

17   of this enhancement.  Chataigne testified that he allowed defendant to assume responsibility

18   for preparing his loan applications because defendant was a "real estate investor" and

19   knowledgeable about real estate transactions as well as a "financial adviser."  As a real estate

20   investor, defendant was in a position of private trust with regard to Chataigne.  Defendant

21   abused that trust when defendant took Chataigne's legitimate financial information and used

22   it to prepare loan applications with false information.

23   In addition, straw buyers Chataigne, Paul and Joyce Johnson (Adorno's parents), and

24   Christine Shiplett viewed defendant as a "real estate expert."  It is irrelevant that defendant

25   was not a licensed  real estate agent or  loan officer.  Rather, since "whether a defendant held

26

27   ---

   [3]   U.S.S.G. § 2B1.1(13)(A) regarding the derivation of more than $1,000,000.00 was

28   renumerated as § 2B1.1(14)(A) in the 2008 edition of the United States Sentencing Commission
   Guidelines Manual.

10

a position of trust must be examined from the perspective of the victim," *Hill*, 915 F.2d at 506 n. 3; and *United States v. Godwin*, 272 F.3d 659, 671 (4th Cir. 2001). The true question is whether defendant was viewed by the straw buyers as occupying a position of private trust. As Chataigne testified, he very much trusted defendant, and felt that trust was abused.

The private trust that defendant enjoyed with many straw buyers can be seen from the personal information defendant obtained in the name of involving them in an "investment." Under the pretense of assisting them to make a real estate investment, defendant obtained social security numbers, income statements, and bank account numbers -- precisely the kind of information provided *only* to a person who occupies a true position of trust, such as a licensed investment advisor, real estate agent, or tax return preparer. Accordingly, the enhancement is proper.

Any objection from defendant to characterizing the straw buyers as "victims" for purposes of this enhancement should be rejected. The indictment charged a wide-ranging conspiracy to commit mail, wire and bank fraud. An essential aspect of that conspiracy to defraud was deceiving many straw buyers. The straw buyers were deceived into believing that (1) they were getting a good investment; (2) defendant had arranged the sale but was not the seller; (3) defendant would repair or decorate the properties and rent them out; (4) defendant would cover mortgage payments as necessary; and (5) the properties would be sold later at a profit. In reality, defendant knew that the houses were overpriced, that they were terrible investments for the amount that was paid, that he would walk away once the straw buyer stopped buying more houses, that the houses would go into foreclosure, and that the straw buyer's credit would be ruined. Accordingly, defendant's scheme depended on misleading the straw buyers, and the straw buyers were victims of defendant's fraudulent scheme.

### D. Defense Objection to Loss: The PSR Correctly Found Losses in Excess of $9.4 Million

Defendant engaged in a continuous scheme to commit mortgage fraud from approximately December 2005 through March 2007. The PSR properly holds defendant

11

responsible for the intended loss to lenders from properties that defendant promoted, in addition to the millions in losses from properties that defendant's co-conspirators foreseeably promoted, for a total loss of approximately $9.4 million.

The defense objects to the formula used by the government to arrive at a loss amount. For the reasons detailed below, the government urges the court to accept the amount of the loan obtained during the conspiracy minus the value of the home when sold in foreclosure.[4]

Under U.S.S.G. § 2B1.1(b)(1), if a crime involving fraud resulted in a loss of more than $5000, the base offense level is increased depending on the amount of actual or intended loss, whichever is greater. *See* U.S.S.G. § 2B1.1 cmt. n. 3(A). "The guidelines do not present a single universal method for loss calculation under § 2B1.1-nor could they, given the fact-intensive and individualized nature of the inquiry." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir.2007). For that reason, § 2B1.1 is not to be applied mechanically in valuing loss and sentencing courts are instructed to " 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.' " *United States v. Stoddard,* 150 F.3d 1140, 1145-46 (9th Cir.1998) (quoting *United States v. Allison*, 86 F.3d 940, 943 (9th Cir.1996)).

Here, the court must consider the "actual loss" which is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). "Pecuniary harm" is "harm that is monetary or that otherwise is readily measured in money" and "does not include emotional distress, harm to reputation, or other non-economic harm." *Id*. cmt. n. 3(A)(iii). "Reasonably foreseeable pecuniary harm" is "pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id*. cmt. n. 3(A)(iv). In calculating actual harm, "[t]he court need only make a reasonable estimate of the loss." *Id*. cmt. n. (C). The guidelines offer the following general instructions for estimation of loss:

---

[4] This same calculus for loss was used and accepted by the Honorable Neil V. Wake in *United States v. Gheorge Babeti*, CR08-00612-PHX-NVW.

The estimate of loss shall be based on available information, taking into account, as appropriate and practicable under the circumstances, factors such as the following:

2009 U.S.S.G. has updated the below factors for estimation of loss, (ii) and (v) will not apply here.

(i) The fair market value of the property unlawfully taken or destroyed; or, if the fair market value is impracticable to determine or inadequately measures the harm, the cost to the victim of replacing that property.

(iii) The cost of repairs to damaged property.

(iv) The approximate number of victims multiplied by the average loss to each victim.

(vi) More general factors, such as the scope and duration of the offense and revenues generated by similar operations. *Id.*

Here, the court could use fair market value appraisals of the property involved in the fraudulent sales to estimate loss (what the victims loaned less the fair market value of what they received at the time of foreclosure). However, the use of fair market value appraisals has some drawbacks because obtaining appraisals is expensive and may cause unacceptable delay in sentencing. *United States v. Crandall,* 525 F.3d 907 (9th Cir. 2008). Moreover, on the facts of this case, the appraisal approach may not fairly reflect economic reality–the actual monetary loss to the lending institutions. *Id.* Although U.S.S.G. § 2B1.1 is silent as to the appropriate valuation date for a loss determination, in this case, the actual loss to the lending institutions at the time of the fraud, as opposed to the time of trial or sentencing, best captures defendant's culpability. *Id.* The volatile nature of the real estate market is wholly independent of defendant's actions and, for sentencing purposes, they should not benefit from the precipitous down turn in the real estate market in Arizona. *See United States v. Gordon*, 393 F.3d 1044, 1052 n. 6 (9th Cir.2004) ("there is little logic in increasing or decreasing a defendant's sentence as a result of unpredictable fluctuating values for misappropriated items in a punitive context"); *United States v. Bae*, 250 F.3d 774, 776 (D.C.Cir.2001) ("the loss associated with their fraudulent procurement is equal to the value of the goods at the time of the offense").

1    But, whatever approach the court takes, it must take a realistic, economic approach

2    that reflects the monetary loss to the victims (lending institutions) of the fraud. *Crandall,*

3    525 F.3d 907 (9th Cir. 2008).

4    Lastly, the total amount of loss based upon the above formula for properties

5    implicated in the scheme equals $9,440,914.02. The government has taken the loan amount

6    obtained for the straw buyer and subtracted it from the amount the property was sold at

7    Trustee sale. (*See* Exhibit A). As this amount exceeds $7,000,000, defendant should receive

8    a twenty level upward adjustment pursuant to U.S.S.G. § 2B1.1(B)(1)(K).

9    ### E.   When Considering Loss Amounts the Court Should Also Consider the Collateral Losses to the Neighborhoods

10    The court's U.S.S.G. §2B1.1 loss calculation also should factor in the losses to the

11    neighborhoods from the foreclosures caused by defendant's criminal conduct. The court can

12    and should consider the collateral consequences of the foreclosures caused by the

13    defendant's fraudulent scheme. Defendant knew that the vast majority of the houses

14    involved in his scheme would go into foreclosure and would substantially impact the value of

15    nearby homes in the neighborhoods.

16    In this case, "the defendant reasonably should have expected that loss would result,

17    [and] he can and generally should be punished more severely to account for his greater level

18    of moral culpability . . . ." *United States v. Innarelli,* 524 F.3d 286, 291 (1st Cir. 2008). For

19    purposes of the guidelines, "a person is presumed to have generally intended the natural and

20    probable consequences of his or her actions." *United States v. Alli,* 444 F.3d 34, 38 (1st Cir.

21    2006). Accordingly, the question is not whether defendant subjectively "intended" to

22    damage the neighborhoods; rather, the question is whether defendant reasonably should have

23    expected that he would inflict damages on the neighborhoods as a "natural and probable

24    consequences of his . . . actions." *Id.*

25    Defendant *did* know that the properties affected by his fraud would go into

26    foreclosure. As noted, defendant deliberately and repeatedly put straw buyers into multiple

27    mortgages that they could not afford for houses that they would not live in. Defendant knew

28

that the straw buyers could not afford the houses because he himself would collect their (truthful) financial information.  Defendant knew that the straw buyers had no intention of living in the houses, had insufficient money to pay the mortgage, and were participating because defendant had lured them with the promise of a kickback.  Worse, in most instances, the straw buyers did not even receive the mortgage bills because the lenders thought the subject homes were primary residences, and were sending the bills directly to the fraudulently purchased homes rather than to the straw buyer's true homes.  Defendant heard the complaints from his straw buyers, did not adequately provide for renters, and knew that any renters who were in the properties for some period of time would not reliably cover the mortgage payments.  Defendant himself did not pay the mortgage after the straw buyers were finished purchasing homes, and was personally informed by the straw buyers in some cases that the houses were going into foreclosure.

Defendant also reasonably should have understood that such foreclosures would negatively impact the value of nearby homes in the neighborhoods.  Defendant knew that the houses would be vacant for long periods of time (often even before being foreclosed upon) and should have known that vacant houses are subject to disrepair, decay, break-ins, and vandalism.  Defendant was experienced in the real estate industry, purchased dozens and dozens of homes, and dealt directly with appraisers.  Accordingly, defendant would have known well how a foreclosure on one house affects the value of all the homes in a neighborhood.

The Eighth Circuit recently has recognized in *dicta* in *United States v. Parish*, 565 F.3d 528 (8th Cir. 2009), that mortgage fraud causes losses beyond those merely inflicted on lenders.  In affirming a district court's loss calculation estimate of between $20,000,000 and $50,000,000, the Eighth Circuit noted that the district court had not even considered "the amount of loss attributed to the remaining classes of victims.  *The financial injuries to subcontractors*, *suppliers, buyers, renters*, *other home owners, the affected cities, and others were real and considerable*."  *Id.* at 535-36 (emphasis added).  There the Court recognized that these losses would have been foreseeable because the defendants "knew, or at the very

least, should have known, the conspiracy would eventually unravel leaving as many as 200 homes vacant and pending foreclosure.  Defendants reasonably could foresee the depressing impact such an occurrence would have *on the local markets and on these property values*."  *Id*.  (emphasis added).  Thus, the losses to the neighborhoods were foreseeable to defendant and should be considered by the Court when evaluating losses pursuant to U.S.S.G. §2B1.1(b)(1).

**VI.    The Court Could Depart Upward Pursuant to U.S.S.G. §5K2.5 to Reflect the Losses to the Neighborhoods**

In the alternative, even if the court does not include the losses to the neighborhoods in its U.S.S.G. §2B1.1(b)(1) intended loss calculation, this Court could depart upward so that the sentence adequately reflects the losses defendant inflicted on the neighborhoods.  Courts of Appeals routinely have affirmed district court's decisions to *double* sentences pursuant to U.S.S.G. §5K2.5 from what they otherwise would be.  *United States v. Hummer*, 916 F.2d 186, 194-95 (4th Cir. 1990) (approving upward departure to 151 months from range of 70-87 months under U.S.S.G. §§5K2.5 and 5K2.14) (abrogated on other grounds by *United States v. Hairston*, 96 F.3d 102 (4th Cir. 1996)); *United States v. Sasnett*, 925 F.2d 392, 398 (11th Cir. 1991) (approving upward departure that doubled defendant's sentence under U.S.S.G. §5K2.5 for "personal injuries and property damage sustained as a result of appellant's wrongful conduct"); *United States v. Perkins*, 929 F.2d 436, 437 (8th Cir. 1991) (approving upward departure to 84 months from range of 30-37 months under U.S.S.G. §5K2.5 based on financial and emotional hardship caused to victim of identity theft).

An upward departure on this basis is particularly appropriate in the case of a bank fraud that causes damage not just to the banks, but to the communities affected by the bank fraud.  Indeed, the Sixth Circuit recently affirmed an upward departure under U.S.S.G. §5K2.5 in a bank fraud case, where the advisory guideline range was 188-235 months, and the district court departed upward to 300 months.  *United States v. Erpenbeck*, 532 F.3d 423, 440 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 518 (2008).  The Sixth Circuit held that this departure was warranted because of "the devastating effect that the unraveling of [the

16

1   defendant's] fraudulent scheme had on the communities he built and sold to unsuspecting

2   homeowners . . . that subdivisions were left in disrepair, streets and parking lots remained

3   unpaved, and some homeowners were left with acrid waterways instead of the pristine lakes

4   promised and paid for when they bought their homes." *Id*.  This damage to the communities

5   was not adequately covered by the guidelines, and thus the Sixth Circuit that held it was

6   appropriate to depart upward to sentence the defendant to an additional 65 months upward

7   from the high end of the advisory guideline range.  *Id*.

8        Exhibit A details thirty-seven fraudulent transactions that defendant and the co-

9   conspirators successfully executed; thirty-six ended in foreclosure.  The results of these

10  foreclosures were devastating to the neighborhoods, where the true victims of mortgage fraud

11  live and suffer the consequences.  As the research has proven, foreclosures result in "vacant,

12  boarded-up, or abandoned properties . . . [that], in turn, contribute to physical disorder in a

13  community, create a haven for criminal activity, discourage the formation of social capital,

14  and lead to further disinvestment."[5]  In addition, even in the absence of crime or vacancy for

15  a significant period of time, foreclosed homes sell for a discount, driving down property

16  values for the entire neighborhood.

17  **VII.   The Court Is Not Required to Vary Upward To Reach a Sentence of 240 Months.**

18       In the absence of granting the government's motion for an upward departure or

19  applying guideline sections that would increase the adjusted offense level and applicable

20  guideline range, the court need only give the defendant a sentence in the middle of the

21  guideline range as calculated by the presentence writer to impose a 240-month imprisonment.

22  (*See* PSR ¶ 67).  As discussed above, and as discussed below in an examination of the factors

23  under 18 U.S.C. § 3553(a), a sentence of no less than 240  months imprisonment is

24  warranted.

25

26

27        [5]   Imergluck, Dan, and Geoff Smith. 2006. *The Impact of Single Family Mortgage
*Foreclosures on Neighborhood Crime. Housing Studies*, 21(6): 851-866; *See* also Exhibit E;

28  *Report for Center for Responsible Lending,*  May 2009.

## VIII.   The Title 18 U.S.C. § 3553 Factors Dictate a Lengthy Sentence

Courts have recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative."  *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997) (emphasis added).  Defendant carried on his destructive scheme with little thought for the consequences.  Now, defendant must pay his debt to society for the damage he inflicted on our financial markets, our neighborhoods, and the lives of his victims.  Only a lengthy sentence will be sufficient to deter others tempted to engage in this lucrative crime.

### A.   Seriousness of the Offense, Respect for the Law, and Just Punishment

Section 3553(a)(2)(a) of Title 18 directs the court to consider when determining the sentence the need for the sentence imposed to:

•   "reflect the seriousness of the offense,"

•   "promote respect for the law," and

•   "provide just punishment."

Just punishment requires a lengthy sentence.  Our country has learned well that mortgage fraud offenses are of the utmost seriousness.  The damage defendant's conspiracy inflicted on lenders was staggering at an intended loss of $9.4 million, with actual losses perhaps higher, affecting tens of millions of dollars in loans.  Those losses to lenders resulted in higher mortgage rates for all borrowers, foreclosure costs, a loss of liquidity, and a loss of confidence in the values of legitimate mortgage loans held by such institutions.  Although there are many interwoven causes of the "foreclosure crisis," fraud is an important -- and the most malevolent -- piece of the causal puzzle that has done so much damage to our economy.

Defendant must be justly punished.  Defendant engaged in a campaign to ravage our neighborhoods, with greed as his only motive and profit his only concern.  The vacant houses left in defendant's wake became havens for crime, repugnant eyesores in the neighborhoods, and caused heartache and hurt precisely in the place where most citizens hope for safety and comfort -- their "home."  Defendant's buyers suffered a loss of credit, bankruptcy, self-esteem, and must now find it hard to trust anyone.  All this damage occurred so that defendant could reap tens or hundreds of thousands of dollars from each transaction.

Defendant had no respect for the law, and was unfazed by his conviction, even after his co-conspirators accepted responsibility.  Rather, defendant continues to attempt to engage in real estate transactions representing that he is willing to pay cash when he unquestionably is  destitute. (*See* Exhibits B and C).  Defendant is motivated by greed, not respect for the law, to an amazing degree.

**B.     Nature and Circumstances of the Offense and Defendant's History and Characteristics**

Section 3553(a)(1) of Title 18 directs the Court to consider when determining the sentence:

- •     "The nature and circumstances of the offense," and

- •     "the history and characteristics of defendant."

These factors further dictate a heavy sentence.  Defendant's offense involved a pyramid of lies directed at one goal -- profit for defendant, regardless of the consequences. Defendant preyed on family members and individuals vulnerable to the promise of financial gain.  Many of the straw buyers in this cases were single mothers.  Defendant was deaf to pleas for help once the mortgage payments came due and foreclosure began.  To accomplish his goals, defendant manufactured documents, forged signatures, and told any lie necessary.

Unbelievably, defendant continued his criminal conduct for several years, seemingly without pause.  And, again, he continues to attempt to engage in real estate transactions while in custody.

**C.     Protecting the Public From Further Crimes by Defendant**

Section 3553(a)(2)(c) of title 18 directs the court to consider when determining the sentence:

- •     "The need for the sentence . . . to protect the public from further crimes of the defendant."

As he continues to engage in fraud while in prison, there is little doubt that defendant will return to fraud when released.  His unwillingness to accept responsibility for his offenses, in light of the guilty pleas from his co-conspirators and his continued criminal activity even following a conviction  defies belief and demonstrates that he is utterly

incorrigible.  Defendant has a silver tongue, and was capable of luring dozens of buyers into his scheme who completely trusted him, much to their detriment.  Once set loose, defendant will cause more havoc with our real estate market and the citizens of our community.

**D.  Adequate Deterrence**

Section 3553(a)(2)(b) of Title 18 directs the Court to consider when determining the sentence:

- "the need for the sentence . . . to afford adequate deterrence to criminal conduct."

There is a massive need for deterrence from mortgage fraud.  The mortgage asset research institute's March 2009 report to the mortgage bankers association reports that "fraud incidence is at an all-time high," and "[e]merging fraud trends are further draining lender, law enforcement, and consumer resources in the industry's most challenging times."  *See* risk.lexisnexis.com/mari.  There were 63,713 mortgage fraud related suspicious activity reports filed with financial institutions in fiscal year 2008, compared to 17,127 such reports in fiscal year 2004 -- an increase of 370%.  The situation is dire.

White collar criminals do a calculus in their heads when contemplating whether to commit a crime.  That calculus necessarily involves weighing the expected benefits of the crime against the probability of being prosecuted and the expected prison sentence.  When the probability of being prosecuted is extremely low, the expected prison sentence must be high in order to create effective deterrence.

"Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted).  Defendant, with a bachelor's degree in Business Management with a Computer Application minor is a perfect example of this calculating white collar criminal. (*See* PSR ¶ 56.)  As the Eleventh Circuit has noted, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment."  *Martin*, 455 F.3d at 1227.

Mortgage fraud is highly lucrative and thus "requires heavy sentences to deter." *Hauptman*, 111 F.3d at 52. With merely false statements, a keen intelligence, a persuasive tongue, and a brazen disregard for the law, defendant made millions. As the court knows, armed bank robbers often receive only a few thousand dollars for much more dangerous work. Mortgage fraud is also difficult to detect. Investigating every foreclosure is simply impossible with current investigative resources, and it often takes years for schemes to be detected, if at all. Straw buyers hesitate to report the crime with false documents submitted in their names, and banks often do not understand why the payments have not been made. Defendant's brash behavior may be explained, in part, by the fact that defendant must have perceived the reward as high, and the punishment as low.

A long sentence for defendant will provide invaluable deterrence for those tempted to engage in this highly lucrative crime. As Judge Easterbrook of the Seventh Circuit has explained, "[t]he system of penalties under the guidelines is constructed on the belief that . . . longer sentences of imprisonment, are more effective deterrents. A large body of evidence supports this intuition." *United States v. Turner*, 998 F.2d 534, 536 (7th Cir. 1993) (Easterbrook, j.). Judge Posner writes that "raising the price of crime" will reduce its incidence. RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW 5 (4th ed. 1992) ("[a]n increase in . . . the severity of the punishment . . . will raise the price of crime and therefore reduce its incidence."). Our country now knows well the true costs of mortgage fraud, and it is time that fraudsters come to learn the price that society will impose upon them for engaging in it. This Court must "raise the price" of mortgage fraud with a heavy and just sentence for defendant .

**E.    Parity in Sentencing: Federal Mortgage Fraud Sentences Nationwide**

Defendant likely will argue that he should receive a lower sentence based on the lower sentences for similarly situated defendants. Any such argument should be rejected. The Eleventh Circuit recently rejected a mortgage fraud defendant's appeal of her 360-month sentence because each of her co-defendants had been sentenced to terms ranging from 5 to 87 months. *United States v. McFarland*, no. 05-14974, 2007 WL 4142782 (11th Cir. Nov. 23,

21

2007), cert. denied, 129 S. Ct. 245 (affirming 360-month sentence for defendant in mortgage fraud scheme).  Attached as Exhibit F is a summary of recent sentences for Mortgage Fraud defendants nationwide. Many of the sentences involve schemes similar to the instance offense where defendants received sentences that ranged between 88 and 336 months. Accordingly, a sentence of 240 months is not unprecedented.

**IX. Conclusion**

Before the court is a 51-year-old male, who has resided in Arizona since 1985.  He is a lawful permanent resident who will likely be deported to his country of origin, Haiti, at the conclusion of his prison sentence in CR 06-260-PHX-JAT and the instant case.  He has had sporadic contact with the criminal justice system since 1995.  His criminal conduct, however, has increased in sophistication and resulted in a 36-month prison sentence in 2007 for Bankruptcy Fraud related to mortgage fraud.  Here, defendant proceeded to trial when all other co-defendants accepted responsibility and pled guilty.  This includes two additional co-conspirators (Dustin Thompson and Sean McLaughlin) that have pled guilty in CR-09-386-PHX-ROS.

For his leadership of a mortgage fraud scheme, both the guidelines and factors under §3553 dictate a lengthy sentence.  The government submits that the following is the applicable guideline based upon loss amounts and offense characteristics:

| | | |
|---|---|---|
| Base offense level: | 31 | U.S.S.G. §2S1.1(a)(1)  Specific offense |
| Characteristic: | +1 | U.S.S.G. §2S1.1(b)(2)(A)(Money laundering 1957) |
| Adjustment for Role in the offense: | +4 | U.S.S.G.  §3B1.1(a)(leadership) Specific offense |
| Characteristic: | +2 | U.S.S.G. §3B1.3(abuse of trust) Specific offense |
| Characteristic: | +2 | U.S.S.G  2B1.1(b)(14)(A)($1,000,000 in gross receipts from financial institutions) |
| Total offense level: | 40 | |

The applicable guideline range, based on the above calculation, in a criminal history category II, is 324-405.  The government is aware that in certain cases where the guideline substantially overstates the seriousness of the offense a downward departure may apply.  (*See* §2B1.1 Application Notes: (19).)  A sentence of 27-33 years imprisonment for the offenses committed here may be  just such a case.  Nevertheless, there are additional reasons to vary upward including losses not taken into account by the guidelines and defendant's continuing pattern of committing fraud while incarcerated.  Instead, the government respectfully requests that the court impose a sentence of  240 months imprisonment which is a sentence in the middle range of the applicable guideline range as calculated by the PSR.

Respectfully submitted this 20th day of January, 2010.

DENNIS K. BURKE
United States Attorney
District of Arizona

s/Kevin M.Rapp
Kevin M. Rapp
Charles Galbraith
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2009, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrant: Michael Smith, Attorney for Mario Bernadel.